J. Russell SMITH, Plaintiff-Appellant,

v.

BOARD OF REGENTS, STATE SENIOR COLLEGES, Defendant-Appellee.

No. 28159.

United States Court of Appeals, Fifth Circuit.

May 26, 1970.

Sam Houston Clinton, Jr., Austin, Tex., for appellant.

Pat Bailey, Asst. Atty. Gen. of Texas, Austin, Tex., for appellee.

Before THORNBERRY, DYER and CLARK, Circuit Judges.

DYER, Circuit Judge:

This is a suit for deprivation of civil rights brought under 42 U.S.C.A. § 1983 and 28 U.S.C.A. § 1343(3) by a former teacher who claimed that his employment at Angelo State College[1] was terminated under circumstances which denied him due process and equal protection of the law. The District Court, sitting without a jury, entered an order denying plaintiff-appellant all relief. We affirm.

Angelo State College is a state school in Texas under the supervision and control of the Board of Regents, State Senior Colleges. Under Rule 14 of the official Rules and Regulations promulgated by the Board of Regents employment contracts are for a one year period only and the president of each institution under the Board's jurisdiction nominates faculty annually to the Board for employment and re-employment. Plaintiff Smith was first employed by Angelo State College for the school year 1964–1965. He continued to teach there and when again recommended by the school president for re-employment he entered into a teaching contract in May, 1966, for the school year 1966–1967.

During the summer of 1966 Smith attended the University of Michigan. The President of Angelo State College, Dr. Cavness, received some unfavorable complaints from the University of Michigan about Smith's conduct there. In October, 1966, shortly after the new school year had begun, President Cavness called Smith in for a conference about this complaint. Nothing concrete came of this conference. It merely ended with President Cavness saying that Smith "ought to get the thing straightened out."

There is no evidence that President Cavness ever indicated to Smith that he had any doubts about recommending Smith as a teacher for the following year. However, the chairman of the department in which Smith taught informed Smith several times that the president had doubts about recommending him for re-employment because of the incident at the University of Michigan and because of reports the president had received about Smith's involvement in a night of debauchery in Houston. The president was also concerned because he felt Smith was not making satisfactory progress toward his doctorate.

Although Smith had learned of the president's doubts second-hand, there is no evidence either that the president made a final decision not to recommend Smith for the following year or that any pressure was applied to Smith by anyone connected with the school to leave the institution. Knowing that there were some doubts about him, though, Smith,

[1]. This is the present name of the institution. When Smith was first employed by the school it was named San Angelo College.

did feel some anxiety and on April 19, 1967, he submitted a letter of resignation to President Cavness, effective at the end of the spring semester, 1967.

The president accepted the resignation. Then on May 1, 1967, Smith wrote a letter to President Cavness in which he referred to the previous letter of April 19 as "resignation by intimidation" and requested a conference with the president. In the meantime, Smith apparently "leaked" the story to the newspaper that he would not be returning to teach the following year and some of the students began demonstrating on his behalf.

Smith requested a hearing from the Board of Regents. On May 19, 1967, the Board held a regularly scheduled meeting in the morning. One of the things it did at that time was formally accept Smith's resignation, along with about 14 others submitted from various institutions under its jurisdiction. The normal procedure was for the president of an institution to inform the Board of resignations, which the Board accepted perfunctorily. On the same afternoon the Board met to give Smith, who was accompanied by counsel, the hearing he had requested. However, since his resignation had already been accepted the Board refused to allow him to withdraw it and refused to hear testimony. The Board told Smith that he could reapply for a position as a teacher at Angelo State. Smith did so but President Cavness never acted on his application.

Rule 15 of the official Rules and Regulations promulgated by the Board of Regents provides that when a faculty member is removed before the expiration of a school term he is entitled, upon written request, to a hearing before the Board at which he may bring counsel and present testimony and evidence in his behalf. In addition, upon written request, the suspended faculty member also has a right to a statement in writing of the charge or bill of particulars.

Rule 16 provides that when the president of an institution determines that a faculty member is not to be recommended to the Board for re-employment upon the expiration of a term of employment (the 1966–67 school year in the instant case), the president is to notify him in writing. Upon written request the president is then to furnish such individual with a written statement of the reasons prompting the non-recommendation and such individual is entitled to a hearing before the Board of Regents with all the same rights given to individuals who obtain hearings under Rule 15. The official Rules and Regulations become part of every teacher's contract of employment.

Smith's several contentions boil down essentially to two: (1) In determining not to renew his contract and in refusing him the opportunity to present testimony and evidence in his behalf, the Board of Regents violated rules 15 and 16 of its own Rules and Regulations, thereby denying him due process and equal protection; and (2) the exclusion of Smith from employment was arbitrary and in retaliation for his exercise of first amendment freedoms in notifying the press of his story.

We have little doubt that a violation of its Rules and Regulations by the Board, *see, e. g.,* Freeman v. Gould Special School District, 8 Cir.1969, 405 F.2d 1153, 1161, cert. denied, 396 U.S. 843, 90 S.Ct. 61, 24 L.Ed.2d 93, and a refusal to recommended Smith for a teaching position for the following year because of the exercise of first amendment rights, *e. g.,* Pickering v. Board of Education, 1968, 391 U.S. 563, 88 S.Ct. 1731, 20 L. Ed.2d 811; Pred v. Board of Public Instruction, 5 Cir.1969, 415 F.2d 851; Johnson v. Branch, 4 Cir.1966, 364 F.2d 177, cert. denied, 385 U.S. 1003, 87 S.Ct. 706, 17 L.Ed.2d 542, would be arbitrary and capricious and that Smith would be entitled to relief. However, the situation in this case does not involve either a refusal to recommend Smith for the following year or a discharge. Smith resigned before either of these possibilities had an opportunity to come to fruition. Nor can Smith get

around this fact by urging his contention of a "resignation by intimidation" or "constructive discharge." The District Court specifically found that his resignation was voluntary and there is more than ample support in the record for this finding. It is sufficient to say, without marshalling all the evidence, that under no theory could the conclusion of voluntariness be "clearly erroneous" within Fed.R.Civ.P. 52(a).

Since Smith voluntarily resigned, rules 15 and 16 of the official Rules and Regulations of the Board of Regents never came into play in this case. Nor do any of the Rules and Regulations provide for a hearing or the furnishing of a bill of particulars when a teacher has resigned. Therefore, the Board did not deny Smith due process or equal protection in failing to apply rules 15 and 16 to Smith and in not allowing him to present testimony.

Smith next contends that President Cavness refused to act on his application for employment as a retaliation for Smith's having exercised his first amendment rights. There is no basis in the record to support this argument. Of course, once Smith voluntarily resigned he was in the same position as any other new applicant. Therefore, his qualifications, including his personality and activities outside the classroom, were subject to examination. E. g., Shelton v. Tucker, 1960, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231; Beilan v. Board of Education, 1958, 357 U.S. 399, 78 S.Ct. 1317, 2 L.Ed.2d 1414; Adler v. Board of Education,[2] 1952, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517; *see* Garner v. Board of Public Works, 1951, 341 U.S. 716, 71 S.Ct. 909, 95 L.Ed. 1317. Although President Cavness was unhappy that Smith had purportedly "leaked" his story to the newspaper he was also unhappy with Smith because of the factors (complaint from University of Michigan, reports of debauchery in Houston, and unsatisfactory progress toward doctorate) which prompted his doubts about recommending Smith for another term in the first place. These factors are clearly valid grounds to refuse to hire a new teacher. See, for example, *Beilan Adler* and *Garner, supra.* Moreover, it was not so much the fact that the story was printed which bothered President Cavness as much as it was that the fact that Smith would no longer be employed by the school was made public before the official announcement was released. President Cavness' concern was not that Smith had spoken out but that he had exercised poor judgment in publicizing the situation before the Board of Regents was officially notified of it.

The judgment of the District Court is free of error and is

Affirmed.

2. Although the basic premise of *Adler*— that public employment can be conditioned upon the surrender of constitutional rights which could not be abridged by direct governmental action—has been rejected in subsequent cases, *e. g.,* Pickering v. Board of Education, *supra;* Keyishian v. Board of Regents, 1967, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629, the minor premise that teachers' qualifications in and out of the classroom may be examined has been left intact.