Willie **J. FLUKER** and Richard L. Parsons, Plaintiffs-Appellants,

v.

**ALABAMA STATE BOARD OF EDUCATION** et al., Defendants-Appellees.

No. 30670
Summary Calendar.*

United States Court of Appeals, Fifth Circuit.

March 31, 1971.

* [1] Rule 18, 5th Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York, et al., 5th Cir. 1970, 431 F.2d 409, Part I.

Michael S. Lottman, Alexandria, Va., for plaintiffs-appellants.

Smith, Bowman, Thagard, Crook & Culpepper, T. W. Thagard, Jr., Gray, Seay & Langford, Fred D. Gray, Montgomery, Ala., for defendants-appellees.

Before THORNBERRY, MORGAN and CLARK, Circuit Judges.

THORNBERRY, Circuit Judge:

At the time this suit was filed in federal court, the appellants, Mr. Willie Fluker and Mr. Richard Parsons, were nontenured members of the faculty of Alabama State University, a state institution of higher learning. Fluker had been employed as a history instructor by the University for the 1968–69 school year under a one-year probationary contract, and was re-hired under a similar one-year contract for the 1969–70 school year. Parsons had been employed as an art instructor under the same terms and conditions and in the same years as Fluker. On December 15, 1969, the President of the University, Levi Watkins, informed each appellant by letter that his contract would not be renewed for the 1970–71 academic year. The President gave no reasons for his action.

Without requesting from President Watkins any hearing or explanation for the nonrenewal of their contracts,[1] Fluker and Parsons filed a section 1983 action[2] in federal district court for the Middle District of Alabama, alleging that their employment was being terminated because of their activities, associations and expressions of opinion, in violation of the First and Fourteenth Amendments to the Constitution; and that they had been given no notice of the charges against them and no hearing or opportunity to respond in any manner. On March 31, 1970, after a hearing on Fluker's and Parsons' allegations, the district court ordered the University to

---

1. This would have been the proper procedure for appellants to follow under the decisions of this Court. See, e. g., Sindermann v. Perry, 5th Cir. 1970, 430 F.2d 939, 944. We attach no penalty to appellants' failure initially to request such a hearing from the University, however, and we likewise decline to condemn the University for failing to provide a hearing when no request for one had been made. Sindermann, supra; Thaw v. Bd. of Public Instruction, 5th Cir. 1970, 432 F.2d 98.

2. 42 U.S.C.A. § 1983 provides as follows: Every person, who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

give Fluker and Parsons formal notice and specification of the charges against them and a hearing on those charges within thirty days. In its findings and conclusions, the court reserved the power to evaluate the adequacy of the University's procedures and to determine whether appellants' substantive constitutional rights had been violated, "if and when" a decision of those issues became necessary.[3]

Pursuant to the court's order, and on the same day it was entered, President Watkins notified Fluker and Parsons each by letter of the reasons for the nonrenewal of his teaching contract. These letters explained that the University wished to employ a person with a doctorate degree in its history department, and a person with a Master of Fine Arts [MFA] in its Art Department "in order to strengthen the facult[ies]" in the History and Art Departments and "in order to comply with the standards of the Southern Association of Colleges and Schools." These letters went on to explain that "in order to make room for the person[s] coming, it [would] be necessary to terminate the services of one existing member" of each Department. Finally, the letters stated that a review of the training and experience of the History and Art faculties had revealed that Mr. Fluker was the only person who had not acquired tenure in the History Department and had been the last person employed in History; and that in the Art Department Mr. Parsons had not acquired tenure and had the least amount of teaching experience and training of anyone in that Department. These letters also invited Fluker and Parsons to attend a hearing on the proposed nonrenewal of their contracts, which hearing was scheduled for April 7, 1970.

The hearing was before the University's Advisory Committee on Faculty Personnel, which is composed of three professors elected by the faculty to hear faculty grievances. The parties were present and represented by counsel. All parties agreed by stipulation upon the procedure to be followed.[4] These procedures included giving both parties the opportunity to make an opening statement, to present witnesses and to cross-examine opposing witnesses, to offer rebuttal evidence and to make closing statements. The lawyers on both sides agreed to avoid objecting to evidence as much as possible, so that the taking of testimony was subject to very few restrictions. In spite of the practically unlimited opportunity to present evidence at the hearing, however, the testimony from both sides was devoted almost entirely to the adequacy of the University's stated reasons for not reappointing Fluker and Parsons, with very little mention being made of any connection between Fluker's and Parsons' alleged first amendment activities and the University's action.[5] The conclusion reached by the Committee in making its recommendation to President Watkins was as follows:

> We, the Advisory Committee on Faculty Personnel, feel that the question is one of whether the President of the University and the Board of Education have a right by law to dismiss non-tenured faculty members for the reasons presented in evidence today. If so, then this Committee feels that the issue of this controversy is beyond its power to render a judgment, therefore the Committee advises that the issues be resolved between plaintiffs and the administration or in a court of law.[6]

---

3. See text accompanying note 7 *infra*.

4. Although appellants joined in the stipulation, they nevertheless objected to certain matters surrounding the hearing procedures, discussed at notes 13–14 and accompanying text.

5. See note 16 *infra* and accompanying text.

6. This verdict did not correspond to the form of decision that the parties had suggested in their stipulation for the Committee to follow. The suggested form read substantially as follows:

   The Advisory Committee on Faculty Personnel, Alabama State University, after having considered all of the evidence,

Upon receiving this opinion from the Advisory Committee, the President of the University notified Fluker and Parsons each by letter that the University's attorneys had advised him that the University did have a right to refuse to renew the contracts of nontenured faculty for the reasons presented in evidence at the faculty committee hearing. Therefore, the letters concluded, Fluker and Parsons would not be recommended for reappointment upon the expiration of their current contracts. Whereupon Fluker and Parsons returned to federal court pursuant to the district court's previous reservation of any remaining questions in the case.[7]

At the commencement of this second hearing before the district court the judge announced his intention to hear any "new additional testimony" that Fluker and Parsons had to present, but requested that they avoid reiteration of testimony presented before the Committee. At this point the attorney for the University objected, arguing that all the parties had been given a full opportunity to present all evidence on all issues in the case before the Faculty Advisory Committee, and that the hearing before the court should be limited to a review of the record made at the hearing. The district judge expressly denied the University's motion on this point and proceeded to conduct a full and independent hearing on the controversy.[8] At the termination of the hearing, the court announced the following pertinent findings and conclusions:

"The evidence in the case reflects that the defendant, Levi Watkins, acting as President of the Alabama State University, on or about December 15, 1969, notified each of those plaintiffs in writing that they would not be reemployed as instructors or in any capacity with the University. No basis was given in that notification for the action taken by the school authorities. However, the evidence is clear—as a matter of fact, it is uncontroverted—that each of the plaintiffs were then officially put on notice that their contracts would not be renewed; that their probationary status would be terminated at the end of the second contract period.

"This Court finds further that each of the plaintiffs have been accorded, fully and completely, any and all procedural rights to which they were entitled. The Court further finds that, even though the plaintiffs occupied a probationary status, even though they did not have any tenure, they are entitled to their constitutional protections—particularly their right not to be punished or to have sanctions imposed upon them by reason of the exercise of their First Amendment rights.

"Another legal principle with which the Court must deal in this case is the hiring and the firing, employment or reemployment, and refusal to employ or reemploy, generally and basically must be vested in the school authorities. There is a factual basis presented to this Court in this case for the action taken by the defendants, acting through the President, Dr. Watkins, for terminating the employment of and for the failure and refusal to re-employ either of these plaintiffs, which basis does not violate any constitutional right vested in the plaintiffs. The evidence in the case convinces this Court that the action taken by the defendants was an altruistic or altruistically motivated action to strengthen the faculty; it was based upon educational and administrative sound principles and reasons as to both the plaintiff, Fluker, and the plaintiff, Parsons. More specifically, and particularly insofar as the plaintiff, Parsons, is concerned, the evidence in this case reflects there are four fulltime faculty members in the Art Department at the university—or there

recommended that the proposed action of President Watkins not to reappoint Instructor[s] Willie J. Fluker [and Richard L. Parsons] for the year 1970–71 is hereby approved [or rejected].

7. See text accompanying note 3 *supra*.

8. *See* note 14 & 16 *infra*.

were at the time this action was taken. None of them had a Master in Fine Arts. The college officials considered it desirable to secure someone with an M.F.A., to be employed commencing with this next academic year. Parsons was the logical person to be selected for termination, since he had less teaching experience than anyone else in the department. He was on probationary status; it was not unreasonable to select him. Going to Fluker, in the History Department: The evidence reflects that at times pertinent here, there were six full-time faculty members in the History Department at the school. Only one of them had a doctorate. The university officials considered that it would be to their benefit—particularly now that they are being reappraised for accreditation by the Southern Association of Colleges and Schools—to secure another doctor in that department. The evidence reflects that it was expedient that someone be eliminated; that the staff be reduced for that purpose. Fluker had the least service in the department; he had no tenure; he was on probation—it was appropriate that he be selected. All of that means that there is a reasonable and factual basis for the action of defendants; and the evidence in this case reflects, and the Court specifically finds, that that was the basis for the action in refusing to re-employ either of the plaintiffs in this case. The Court further finds that the plaintiffs had fair and reasonable notice that they would not be re-employed.

"The Plaintiffs seem to place some emphasis in this case on activities in which they say they participated during the period of unrest and agitation on the Alabama State campus in May of 1969. They seem to contend that this gives them some insulation from being selected for termination. The Court finds that there is no—first, there is no basis in fact for the contention on the part of the plaintiffs that their activities constituted a basis for the action taken by the school authorities. The Court doesn't find it necessary to determine in this case whether the activities engaged in by each of the plaintiffs in this case and the attitudes of each of the plaintiffs toward the college administration would sustain the action of terminating their employment. I make no findings on that point."

Based on these findings and conclusion, the district court entered an order denying appellants' motion for preliminary injunction, and denying any and all other and further relief sought by both parties. From this final order, appellants prosecuted the instant appeal.

Fluker's and Parsons' specifications of error on this appeal may be classified under two major headings: (1) Procedural issues and (2) factual issues. Although we are of the opinion that the basic issue in the case is whether the district court's findings pass the "clearly erroneous" test of Rule 52(a), F.R. Civ.P., we will deal fully with each issue the appellants raise.

## I.

### Procedural Issues

First, the appellants contend that the district court erred in placing on them the burden of proof to show that their First Amendment rights had been violated.[9] But the law in this Circuit is crystal clear that a non-tenured teacher alleging that he has been dismissed for constitutionally impermissible reasons "must bear the burden * * * of proving that a wrong has been done by the collegiate action in not rehiring him." Sindermann v. Perry, 5th Cir. 1970, 430 F.2d 939, 944. See also Thaw v. Bd. of Public Instruction, 5th Cir. 1970, 432 F.2d 98; Glover v. Daniel, 5th Cir. 1970, 434 F.2d 617.

9. The district court made no ruling one way or the other about who had the burden of proof. Appellants seem to assume, however, that the court must have placed the burden on them since they lost their case. In any event, if the district court did place the burden on appellants, there was no error, for that is where the burden belonged.

Appellants next seem to argue that even if they had the burden of proof initially, they "at least made a sufficient circumstantial showing to shift the burden of going forward onto the University." This contention goes primarily to the sufficiency of the evidence, which we will take up later. But we wish to note at this point that under the law of this Circuit, neither the burden of going forward nor the burden of proof shifts to the State until it has been established by the complainant that he has been dismissed for exercising his constitutional rights. At that point, the State assumes the burden of justifying its action by showing that the complainant's activities "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." Tinker v. Des Moines Independent Community Sch. Dist., 1969, 393 U.S. 503, 509, 89 S.Ct. 733, 738, 21 L.Ed.2d 731; *quoting* Burnside v. Byars, 5th Cir. 1966, 363 F.2d 744, 749; Pickering v. Bd. of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Butts v. Dallas Independent School Dist., 5th Cir. 1971, 436 F.2d 728; Pred v. Bd. of Public Instruction, 5th Cir. 1969, 415 F.2d 851, 858–859; *cf.* Battle v. Mulholland, 5th Cir. 1971, 439 F.2d 321.

Appellants also raise a number of procedural issues having to do with the adequacy of the University's general handling of the non-renewal of their contracts. First they insist that they did not receive timely notice of their non-reappointment, in violation of the University's own rules. The pertinent University regulation requires that "if a probationary faculty member is not to be recommended for reappointment, notice is given to him in writing by the President no later than * * * December 15 of the second year of service if the appointment expires at the end of the academic year." Appellants do not dispute that they received a written notice of their termination on December 15, 1969, in compliance with this regulation. Appellants argue, however, that this notice did not count, for several reasons. They contend that the effect of the December 15 notice was erased by the trial court's first order in this litigation, entered March 31, 1970, in which it set aside the action taken by the University on December 15, pending the outcome of the faculty committee hearing.[10] We find this contention unpersuasive. The fact that the trial court set aside the University's action in not reappointing appellants does not, of course, mean that appellants no longer had actual knowledge that the action was being proposed. That the trial court did not intend to nullify the notice provided by the December 15 letter is evident from the court's own finding in its final order that "the evidence is * * * uncontroverted that each of the plaintiffs were * * * officially put on notice [on December 15, 1969] that their contracts would not be renewed." Appellants also seem to suggest that the lateness of the final decision on their case prevented them from seeking new employment. The record simply does not support this argument, for in the hearing before the faculty committee and the hearing before the district court, both Fluker and Parsons testified that they began looking for new employment shortly after receiving the December 15 notice. We are therefore of the opinion that any delay in the final determination of appellants' status occasioned by the administrative and judicial hearings on their case can in no way be said to have cancelled the effect of the otherwise timely December 15 notice.[11] Appellants' second procedural

10. *See* text accompanying note 3 *supra*.

11. The only case cited by appellants to support this contention is Greene v. Howard University, 1969, 134 U.S.App.D.C. 81, 412 F.2d 1128, a case that is clearly distinguishable from the instant case. In *Greene*, faculty members were notified for the first time on June 20, 1967 that after the automatic termination of their contracts on June 30, 1967, they would not be reappointed. This outrageously late notice was in violation of the University's own rules requiring that deans give writ-

point about the University's general handling of their case is that the University deprived them of due process by failing to put them on notice of the standards for continued employment. Thus, they argue, had they known they were subject to being replaced by persons with terminal degrees in their fields, they might have tried to earn the terminal degrees themselves while employed at the University. The principle appellants seem to argue for here is that a nontenured teacher must be rehired unless it can be demonstrated that he has failed to comply with some previously announced standard. However salutary this principle might be for the security of probationary school teachers and college professors, there is nothing in the decisions of this Circuit that would require such a procedure.[12] It is easy to see, moreover, that the enforcement of the principle appellants advocate could readily tie the hands of a school or college like Alabama State University in any institutional effort to upgrade its faculty and academic standing by relocating or replacing faculty members. Appellants' proposal of this requirement also ignores the highly subjective nature of employer-employee relationships. This fact of life about certain working relationships has been recognized by the Supreme Court in cases where even First Amendment rights clearly are involved. Pickering v. Bd. of Educ., 391 U.S. at 569, 88 S.Ct. at 1735, n. 3. In *Pickering* the Supreme Court declined to announce any general standard governing the First Amendment activities and statements of teachers or other public employees "[b]ecause of the enormous variety of fact situations in which critical statements by teachers and other public employees may be thought by their superiors * * * to furnish grounds for dismissal." 391 U.S. at 569, 88 S.Ct. at 1735. We think the Supreme Court's observation in *Pickering* is also applicable to the question whether the grounds for a University's nonreappointment of probationary faculty must be limited to violations of a preannounced "code of conduct." Roth v. Bd. of Regents, 310 F.Supp. at 983. We can see that, not unlike the situation in *Pickering*, there are an enormous number of fact situations in which the nonreappointment of an employee may be justified by highly subjective and perhaps unforeseeable considerations. *Cf., e. g.,* Thaw v. Bd. of Educ., *supra.* It is plain to us, therefore, that at least insofar as probationary faculty is concerned, we must decline to promulgate the requirement urged upon us by appellants. Sindermann v. Perry, 430 F.2d at 944.

▪ Appellants' final complaint about the fairness of the University's actions bears on the adequacy of some of the procedures surrounding the hearing before the Faculty Committee. The asserted defects are twofold: First, appellants claim that certain members of the Faculty Committee were biased against them[13] and that there was no mechanism

---

ten notice of non-reappointment not later than December 15. The D.C. Circuit held that the failure to comply with the December 15 notice requirement constituted a violation of the University's contract with its faculty, entitling the aggrieved faculty members to prove and recover damages. The instant case resembles *Greene* in neither its facts nor its rationale. No violation of contract is involved here, and here the University has complied precisely with its own December 15 notice requirement.

12. There are cases that would require notice of reasonably specific standards of conduct before students may be disciplined in a public university. *E. g.,* Soglin v. Kauffman, 7th Cir. 1969, 418 F.2d 163,

164. A University's relationship with its students in disciplinary proceedings, however, is clearly distinguishable from a University's employer-employee relationship with its nontenured faculty. *See* Roth v. Bd. of Regents, W.D.Wisc.1970, 310 F.Supp. 972, 974. *See also* Sindermann v. Perry, 5th Cir. 1970, 430 F.2d 939, 944. *But cf.* Lucia v. Duggen, D. Mass.1969, 303 F.Supp. 112, 113, 118.

13. Specifically, the charges of bias were that (1) all members of the Committee were tenured while members of Fluker's and Parsons' class—nontenured faculty— were excluded; and (2) that one member of the Committee was a colleague of Fluker's in the History Department and

in the Committee's procedures for challenging that bias; and secondly, they claim that the faculty hearing was a meaningless procedure because the President of the University retained the ultimate power to accept or reject any decision made by the Faculty Committee. The district judge declined to rule on these alleged defects because he had given Fluker and Parsons a de novo hearing on the substantive issues, which hearing he apparently felt cured any defects in the Faculty Committee's procedures.[14] This ruling by the district court was not error.[15] Ferguson v. Thomas, 5th Cir. 1970, 430 F.2d 852, 855. Moreover, we have carefully reviewed the district judge's handling of this case and concluded that his was an extensive and independent review of the evidence, which afforded appellants their full procedural rights. *See* Foster v. Bd. of Education, 5th Cir. 1970, 431 F.2d 648.

This brings us to the second major heading of issues raised by the appellants, their contentions that the district court's factual conclusions are not supported by the evidence. Since the proceeding in the district court constituted an independent hearing on the facts, the scope of our review is limited to a judgment whether the court's conclusions were "clearly erroneous." F.R.Civ.P. 52 (a).

## II.

### Factual Issues

Fluker and Parsons raise two factual contentions here, one of which is actually a postulate of the other. First, they insist that the facts do not support the University's stated reason for its action.[16] Then, they contend that the facts

would therefore necessarily be passing judgment on his own qualifications in order to evaluate Fluker's.

14. The following exchange occurred between appellants' counsel and the district judge on this point:

MR. LOTTMAN: Your Honor, I don't mean to keep bringing things up, but I would—I would like to correct the impression I have given that we are satisfied on all the procedural issues. We raise some procedural questions in the complaint, and I—I think that the most serious one is that—that this hearing that was given was in truth and in fact a meaningless exercise. The President proposed the action, that the hearing committee make a recommendation; the President reserved the right to accept it or reject it; so that in fact the decision of the hearing committee, we—

THE COURT: I have given you a hearing on substantive issues. It is completely de novo. I ruled with you this morning on that point. So why are you so concerned about your procedural rights?

MR. LOTTMAN: Well, we do think they ought to be raised to the extent that your honor might consider them.

THE COURT: All right; they are raised; they are in the record.

*See also* text accompanying note 8 *supra.*

15. Ideally, under dictum in Ferguson v. Thomas, 430 F.2d at 858–59, the district

court in the instant case would have been well-advised had it confined its rulings to a review under the substantial evidence rule of the testimony presented to the faculty committee and to a determination on the merits of appellants' procedural points. We do not fault the district court for failing to follow the dictum of *Ferguson*, however, for at the time the district court held its second hearing in this case, *Ferguson* had not been decided. Moreover, under the clear *holding* of *Ferguson*, we cannot now say that it is reversible error for a district court to provide curative procedures. For the result in *Ferguson* stands for the proposition that when curative procedures have been followed by the district court, it is "[un]necessary for [the] cause to be remanded to the district court for referral back to the school board." 430 F.2d at 858; and the appellees in their brief on this appeal rely on *Ferguson* for that proposition.

16. At the hearing before the Faculty Committee, Fluker and Parsons apparently were proceeding on the theory that to make their case they would have only to show that there was no basis in fact for the non-renewal of their contracts. *See* Roth v. Bd. of Regents W.D.Wisc. 1970, 310 F.Supp. 972. Otherwise, there would be no reason for appellants' failure to develop their constitutional claims before the Faculty Committee. *See* text accompanying note 5 *supra.* At some time between the hearing before the Faculty

adduced do establish that the real reason for the University's action in withholding their reappointment was to retaliate for their anti-administration activities.

█ Under the law of this Circuit, when a complainant has not charged the violation of substantive constitutional rights in the nonrenewal of his contract, the courts will not inquire into the reasons for the State's action, or the adequacy or factual support for those reasons. Thaw v. Bd. of Public Instruction, *supra*; Sindermann v. Perry, *supra.* When the violation of substantive constitutional rights has been charged, however, to the extent that the absence of factual support for the stated reasons for the University's action tends to prove that some other constitutionally impermissible reason underlies the action, the courts should examine the credibility of the University's stated reasons. Johnson v. Branch, *supra*. Thus, in the instant case, if the appellants could demonstrate that there was no factual basis for the University's action, this would tend to prove that other, constitutionally impermissible reasons motivated the University's action. On the other hand, even if the facts do support the stated reason for the University's action, the appellants would still not be precluded from demonstrating that constitutionally impermissible purposes were also involved. *Cf*. Johnson v. Branch, *supra.* With these principles in mind, we turn to a review of the district court's findings of fact.

The district court found that "the action taken by the [University] was an altruistic or altruistically motivated action to strengthen the faculty." In both the hearing before the faculty committee and the district court, Fluker and Parsons sought to discredit the "altruism" of this motive by putting on testimony which they thought revealed some imperfections in the University's plans and

reasoning. For example, the University's academic Vice-President, Dr. Reid, testified that to meet the accreditation requirement of the Southern Association, one-fourth of the History faculty should hold the earned doctorate. At the time of the hearing, the University's History Department included one doctorate in six full-time members. Thus, Dr. Reid testified, it would be necessary to replace one nondoctorate member of the History faculty with a doctorate to meet the minimum twenty-five percent. On cross-examination, in an apparent effort to prove that an additional doctorate was not needed in the History Department, appellants' attorney asked Dr. Reid whether two doctorates out of six was not more than 25%, and whether he would concede that 25% of six could be either one *or* two. Appellants' counsel also attempted to impeach Dr. Reid's testimony by pointing out that another member of the History faculty was "close to earning a doctorate." Dr. Reid testified at the Faculty Committee hearing that he had not been aware of this particular faculty member's doctoral plans. But in a later June deposition, taken for the purposes of the hearing before the district court, Dr. Reid testified that he had since inquired about this particular faculty member's plans from the head of the History Department and had learned that "the doctoral degree would not be forthcoming in the immediate future." More important on this point, perhaps, is that the appellants themselves never produced affirmative evidence to prove the imminence of two doctorates in the History Department.

Another point which appellants raised at the Faculty Committee hearing to impeach the motives of the University was that there was actually no such entity as the History Department—rather, it was the Department of History and Political Science which as a unit

Committee and the second hearing before the district court, however, appellants must have realized that they would also have to present evidence that the University violated their substantive consti-

tutional rights, for most of the evidence presented to the district court was devoted to appellants' claims of infringement on substantive constitutional rights. *See* text accompanying note 8 *supra.*

█

contained three doctorate members out of twelve, or 25%. Dr. Reid testified, however, that he did not think the Southern Association would be willing to count the History and Political Science Department as one department for the purposes of its 25% requirement. Appellants then questioned Dr. Reid about the Mathematics faculty, which was also deficient in doctorates. Dr. Reid testified in reply that he hoped the Southern Association *would* treat the Mathematics Department as part of the Department of Chemistry, Mathematics and Physics, in which case the 25% requirement would be satisfied. Appellants contended that this approach to Mathematics was inconsistent with the University's approach to the situation in the Department of History and Political Science. Dr. Reid's answer was that he realized it was inconsistent, and that while he was hopeful the Southern Association would accept the University's presentation of Chemistry, Mathematics and Physics as one department, he was not at all confident that the Association would do so. As it turned out, Dr. Reid's apprehensions were justified. For by the time of the hearing before the district court, the Visiting Committee of the Southern Association had visited Alabama State and rendered a tentative report which indicates that it apparently was not willing to treat Mathematics as part of Chemistry and Physics. This report, which was admitted in evidence in the district court proceedings, made the following recommendation:

> The Visiting Committee urges the Vice-President, the divisional chairman, and department chairmen not to relax their effort to add more doctorates to the faculty. This is especially crucial in such fields as mathematics where there are six faculty members at Alabama State University but with none holding the doctorate.

■ Furthermore, the Record shows that by June 1970, when Dr. Reid's deposition was taken for the purposes of the hearing before the district court, the University had hired persons with Ph. D's, or persons who would have received Ph.D's by the time the University began its fall semester, in Mathematics, English, Languages, Physics, Biology, and was making an effort to find a Ph.D in Business Administration. The appellants apparently would have this Court believe that this massive recruitment of new faculty was all part of an "ex post facto" effort by the University to justify the non-renewal of appellants' contracts. We find this charge singularly unpersuasive and we conclude that the Record amply supports the district court's findings that the action taken was altruistically motivated "to strengthen the faculty."

Even though we conclude that the Record supports the district court's findings with respect to the stated reasons for the University's actions, appellants might still obtain relief if they could establish their claim that the University's action was even partially in retaliation for their anti-administration activities. On this point, the district court found that "there was no basis in fact for the contention on the part of the plaintiffs that their activities constituted a basis for the action taken by the school authorities." The task before the appellants in this Court is therefore to show that the district court was clearly erroneous in this finding.

Fluker and Parsons presented evidence that they were instrumental in circulating a petition in May 1969 asking President Watkins to call a faculty meeting to discuss *class schedules and the semester calendar for the duration of a semester* in which certain campus disturbances had apparently interrupted the normal functioning of the University. Fluker and Parsons contended that President Watkins never answered this petition, but there appears in the Record a letter from President Watkins directed to the entire University Community in which he addressed himself to the very questions raised in the petition. Fluker and Parsons also asserted that twelve of the forty-five faculty members who signed the petition were "no longer employed

by the University." On cross-examination of Mr. Fluker, however, he stated that only three of those twelve had been discharged, and on further questioning it became clear that he had no factual basis for making even that statement, other than his own opinion that they had "in effect" been discharged. *Cf.* Smith v. Bd. of Regents, 5th Cir. 1970, 426 F.2d 492.

In addition to claiming that other members of the faculty had been discharged for alleged anti-administration activities, Fluker and Parsons also charged that another faculty member who had signed the petition had been demoted. The only evidence appellants presented to support this charge was that the particular faculty member's rank appeared to be reduced in the catalogue. Both President Watkins and Dr. Reid testified, however, that this was apparently one of several typographical errors in the University's catalogue. Again, on this point, as on their other points, appellants offered circumstantial evidence from which they apparently expected the court to draw a conclusive inference. They never produced direct evidence that any of these persons had been discharged or demoted. They never produced as witnesses the persons whom they claimed to have been discharged or demoted. We cannot say that the district court was "clearly erroneous" in declining to accept such evidence.

Fluker and Parsons also claimed that they had been active in the formation on campus of a chapter of the American Association of University Professors and that the University attempted to · discourage their efforts to organize the AAUP Chapter. The Record we have before us, which of course, appellants had a free hand in constructing, simply does not support this charge. As a matter of fact, it appears that the Faculty Handbook of the University encouraged membership in the AAUP, and the Record also contains an issue of the *ASU Items*, a weekly newsletter published by the President's office, announcing the organization of an AAUP on the campus.

Another piece of evidence on which appellants rely to support their charge that they were dismissed in retaliation for their opposition to the administration is that they refused to answer a letter from President Watkins, which had been sent to twenty-five faculty members, asking for any information that these faculty members might have in connection with the disruption of classes experienced on campus. Appellants refused to comply. They seem now to rely on the solitary fact that they refused to comply to bolster their contention that their nonreapppointment was retaliatory. But, again, they presented no evidence that President Watkins ever took steps to induce their compliance or to reprimand them for their refusal to comply.

The last substantial piece of evidence offered by appellants to support their claim of infringement on constitutional rights was presented by appellant Fluker who claimed that he was "ordered to keep a record of every phone call and visitor to his office, and the nature or subject matter of the call or visit." The record Fluker kept is in evidence on this appeal. It is in the nature of an appointment book, which records the date and name of persons having appointments with Fluker. Under "nature of call," his visitors for the most part designated that the visit was either "friendly" or "academic." That Fluker kept his record is not disputed. That he was "ordered" to keep it most definitely is. President Watkins testified that he never ordered Fluker to keep such a record, but that he suggested to Fluker's department head that Fluker keep the record because of complaints that congestion in and near Fluker's office was disturbing other teachers. President Watkins testified that he made the suggestion in order to solve this congestion problem, and that he thought that if Fluker would ask his visitors to come on an appointment basis he could handle them in a more "systematic" manner. Appellants introduced no evidence to contradict President Watkins' statement. Moreover, Fluker never showed that he was required to turn the book over to au-

thorities or that the book was used in any way against him or any of his visitors. The book appears in the Record; we have examined it, and it appears innocuous on its face. Given the total absence of evidence that this appointment book was used or intended for any purpose other than to bring order to Fluker's office, we decline to accept appellants' obvious invitation to infer from this evidence that they were being "watched."

We have examined the Record in this case carefully in search of any evidence of unconstitutional action by the University. We have found none. Fluker's and Parsons' allegations are either unsupported by the facts or contradicted by the testimony of other witnesses. Moreover, both Dr. Reid and President Watkins testified that Fluker's and Parsons' activities had nothing whatever to do with the University's decision not to renew their contracts.

In conclusion, we hold that the Record amply supports the credibility choices and fact findings of the district court, and we affirm the decision of the court below in all respects.

Affirmed.

Hays, Circuit Judge, dissented in part and filed opinion.