**David LUCIA, Plaintiff,**

**v.**

**James DUGGAN et al., Defendants.**

**Civ. A. No. 69–424–G.**

United States District Court
D. Massachusetts.

Aug. 26, 1969.

Haskell C. Freedman and Philip A. Mason, Brown, Rudnick, Freed & Gesmer, Michael Altman, Boston, Mass., for plaintiff.

George B. Adams, Jr., Palmer, Mass., for defendants.

## OPINION

GARRITY, District Judge.

This case arises upon plaintiff's complaint under the Civil Rights Act of 1871, 42 U.S.C. § 1983, for injunctive relief and damages based upon his allegedly improper dismissal as a teacher in the Monson public schools. The defendants are the members of the Monson school committee at the time of his dismissal on January 30, 1969, the present members of the Monson school committee, and the superintendent of the schools of the town of Monson. The superintendent has occupied his position since before the inception of the events in question until the present.

On June 10 the court denied plaintiff's motion for a preliminary injunction, principally upon the ground that his reinstatement as a teacher pending final determination of this case would have caused further confusion and disruption for the students in his classes disproportionate to its possible benefits to plaintiff. The court has since complet-

ed a trial of the merits of this case without jury at which most of the facts stated in the following findings were stipulated by the parties.

## Findings of Fact

1. Monson, Massachusetts, is a small town near Springfield in the western section of the state and has a population of approximately 4,000 people exclusive of the inhabitants of a state hospital located there.

2. Plaintiff was originally hired to teach in the Monson public schools for the school year 1966 through 1967. His contract was renewed for the school years 1967–'68 and 1968–'69. His most recent contract was effective for one year beginning September 1, 1968 and includes the following termination provision:

> This contract may be terminated by mutual consent at any time, or by written notice of termination by either party thirty (30) days before the effective date of such termination, provided the termination by the School Committee shall be subject to the provisions of the law prescribing procedures for the dismissal of teachers and that contract termination by either party may not take place within thirty (30) days immediately preceding the opening or closing of the school year.

At the time of his dismissal on January 30, 1969, plaintiff had not yet attained tenure status.

3. From the time he was originally hired until the end of December 1968 plaintiff was clean-shaven, with one minor exception noted below. During the winter school vacation of 1968–1969 plaintiff began to grow a beard and returned to school with a beard when classes resumed on January 2. Plaintiff has continued to wear a beard to this date. While the beard covers his face, it has been at all times short, neat, and well-trimmed. Plaintiff performed his duties as a teacher from January 2 to January 17 and during that time there was no disruption of his classroom or the learning situation caused by his wearing a beard.

4. During the first week of January defendant Donovan, the superintendent of schools, spoke to plaintiff and told him that it was the unwritten policy of the school committee that teachers should be clean shaven on the job. On January 8, as a result of questions and remarks directed from a few citizens of Monson to members of the school committee, the committee directed Mr. Donovan to write a letter to plaintiff "expressing the thoughts of the committee and the superintendent of schools with respect to his wearing of a beard while in the performance of his professional duties."

5. On January 13 the principal of the Junior-Senior High School where plaintiff was teaching summoned plaintiff to his office and told plaintiff that the school committee had a policy that teachers should be clean shaven on the job. He mentioned two prior occasions when teachers had worn beards, one during the previous Fall when the principal had given plaintiff permission to raise a few days' growth in conjunction with a Halloween costume and the other when another teacher had appeared wearing a beard at the teachers' meeting on the day before the start of the Fall 1968 school term. He reminded plaintiff that the other teacher had shaved his beard off that night at the principal's request.

6. On January 15 plaintiff was called into the office of the superintendent who handed him the following letter:

Dear Mr. Lucia:

On Wednesday, January 8, 1969 the Monson School Committee discussed the wearing of beards and moustaches by male members of the staff. It is our wish that our teachers not have a beard or moustache while in the performance of their professional duties.

It is requested that you not wear a moustache or beard while teaching.

Very truly yours,

William F. Donovan

Superintendent of Schools

Mr. Donovan then told plaintiff, "Were I you, I'd remove the beard, but the decision is up to you." Plaintiff asked for an opportunity to meet with the school committee and was told that he could attend the meeting that night if he wished.

7. That evening plaintiff coached a basketball team in a local recreational league and went directly from the basketball game to the meeting, arriving in shirt sleeves and generally "unkempt." He and the school committee members discussed the matter of his wearing a beard, each member stating his reasons for feeling that it was not appropriate for a teacher to wear a beard in the classroom. Although the meeting was amicable, at least one member of the committee felt that plaintiff's attitude was "arrogant." Plaintiff stated to one member that Monson was one hundred years behind the times and it was the duty of the school committee to provide leadership in the town. As he was leaving the meeting room, plaintiff stated, "What are you going to do about it?" One of the committee members, Mrs. Skwark, responded, "David, it is not what we are going to do about it. It is what you are going to do about it."

8. On January 16 the school committee met and voted that plaintiff "be suspended as a teacher from the Monson School System for a period of seven (7) school days because of insubordination and improper example set by a teacher in the Monson School System, said suspension to commence on Monday, January 20, 1969 and continue through January 28, 1969 in accordance with the provisions of Massachusetts General Laws, Chapter 71, Section 42D." Plaintiff was not notified that the school committee was going to consider suspending him as a teacher nor was he given any notice of the January 16 meeting. On the next day a letter signed by Mr. Donovan and dated January 17 was served in hand upon plaintiff by a deputy sheriff of Hampden County setting forth the school committee's vote and advising him of his suspension. Plaintiff was suspended on Monday, January 20. The last school day for which he was paid was Friday, January 17.

9. On January 28 the school committee held another meeting. Plaintiff was not informed of it. In executive session the committee voted that, if plaintiff should appear at school with a beard on January 29, the superintendent should suspend him for an additional two days. The committee also voted that it would hold a meeting on the evening of January 30 "for the purpose of voting on the dismissal of David Lucia." Upon his arrival at school on January 29, plaintiff was told to report to the office of the superintendent who informed him that he was suspended for an additional two days. The superintendent said nothing else about the school committee's action of the night before.

10. Plaintiff was not notified of the meeting of January 30 nor informed of its purpose. The meeting, however, did receive advance local publicity and on the 29th plaintiff sent the following telegram to the chairman of the school committee:

WOULD LIKE TO HAVE LEGAL COUNSEL AT MEETING TOMORROW NIGHT BUT LAWYER IS NOT AVAILABLE UNTIL MONDAY. WOULD YOU POSTPONE MEETING UNTIL THEN

Plaintiff received the following telegram in response from the chairman shortly before the January 30, meeting convened:

MEETING NOT POSTPONED. YOU MAY PERSONALLY PRESENT YOUR REQUEST TO FULL COMMITTEE TONIGHT

11. When the school committee convened its meeting on January 30, the

chairman, defendant Duggan, immediately resigned and, after a number of nominations for chairman were declined, defendant Raleigh was appointed temporary chairman. Plaintiff then appeared before the committee in executive session accompanied by a non-lawyer friend and requested that the meeting be postponed because of his inability to be represented that evening by legal counsel. His request was not granted and he was so advised. A group of about thirty or forty townspeople had gathered in the hallway and the committee requested that they appoint one or two spokesmen; this done, the townspeople followed their appointed spokesmen into the meeting room and were allowed to stay there. They proceeded to ask questions as to what the charges were against plaintiff and why a good teacher in the Monson schools should be removed. The members of the committee answered the questions either with silence or with the statement that "Mr. Lucia knows what the charges are." After the townspeople finished asking questions they left the meeting room and the school committee returned to executive session.

12. Upon Mr. Donovan's recommendation, the committee voted unanimously to dismiss plaintiff and the superintendent of schools was directed to so notify plaintiff. Each member of the committee thereupon resigned from the school committee and left the meeting. The minutes of the meeting, unlike those of the meeting on January 16, record no reason for plaintiff's dismissal. The reasons for his dismissal, according to the parties' stipulation, were: (a) the raising of a beard; (b) insubordination in refusing to comply with the order of the school committee to shave his beard; (c) bad attitude before the school committee on January 15, 1969; (d) improper dress before the school committee on January 15, 1969. At no time during the events of January did the school committee specifically give plaintiff the choice between shaving his beard and having his employment terminated.

13. Throughout his employment in the Monson public school system plaintiff was consistently rated good or excellent in all facets of his performance of his duties. The sole exception was in the rating for grooming that was given him after his suspension. No member of the school committee ever observed plaintiff teaching.

14. The Monson public schools have no regulation or order prohibiting teachers from wearing beards. In August 1968, however, a dress code pertaining to students was adopted and it included the sentence, "Mustaches and beards will not be tolerated."

15. After his dismissal on January 30 plaintiff attempted unsuccessfully to secure employment elsewhere as a public school teacher. He wrote to the public schools in Portland, Oregon and the Massachusetts towns of East Longmeadow, Longmeadow, Amherst, and Belchertown. Most of his inquiries were not answered and those that were either rejected him or stated that no positions were open. It is fairly inferable that one reason, if not the only one, why plaintiff has been unable to secure employment as a public school teacher is because he was dismissed by the Monson school committee for no stated reasons. After remaining unemployed for six weeks plaintiff secured a factory job with Springfield Molders Company at $75 per week which he held for a period of ten weeks; since then he has earned $80 per week with a car manufacturing firm.

16. Plaintiff's compensation as a public school teacher in Monson averaged $124 per week. Since he had received advances for the portion of his contract term for the school year 1968–1969, which would have otherwise been payable during the summer months, the total amount that has not been paid plaintiff under that contract is $1,575.

17. Plaintiff's health was good on January 1, 1969. As a consequence of his dispute with the defendants and their

dismissing him his weight decreased by 15 pounds and a preexisting ulcer was aggravated. In suspending and dismissing plaintiff defendants acted in good faith and on the basis of their understanding of Massachusetts law relating to teachers without tenure.

## Conclusions of Law

■ The gravamen of plaintiff's complaint is that the defendants, under the color of state law, have deprived him of the rights, privileges, or immunities secured by the Constitution and laws of the United States. 42 U.S.C. § 1983. It is not controverted that plaintiff's discharge was under the color of state law. And the fact that plaintiff probably has a valid action against them in the courts of Massachusetts for breach of contract[1] is no bar to this action under 42 U.S.C. § 1983. "The federal remedy (42 U.S.C. § 1983) is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked." Monroe v. Pape, 1961, 365 U.S. 167, 183, 81 S.Ct. 473, 482, 5 L.Ed.2d 492; McNeese v. Board of Education, 1963, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622. In this case, in which the state remedy probably would go only to the length of time required before a dismissal would become effective and not therefore directly decide the issues here raised, abstention would be particularly inappropriate.

■ Two of the four reasons for plaintiff's dismissal pertained to his growing a beard and two pertained to his conduct before the school committee

on January 15, 1969. Plaintiff's primary contention has been that he has a constitutional right to wear a beard and that the action of the defendants in suspending and dismissing him operated to deny him that asserted right. But plaintiff has cited no cases so holding, *obiter dicta* in Breen v. Kahl, W.D.Wis., 1969, 296 F.Supp. 702, being the closest authority known to the court, and the court shares plaintiff's uncertainty as to the constitutional foundation of such a right. Is it a fundamental personal freedom calling for application of the rule, "Where there is a significant encroachment upon personal liberty, the State may prevail only upon showing a subordinating interest which is compelling"?[2] Bates v. Little Rock, 1960, 361 U.S. 516, 524, 80 S.Ct. 412, 417, 4 L.Ed.2d 480. May any such freedom derive directly from the Fourteenth Amendment or must it be found within the penumbra of specific guarantees of the Bill of Rights? See Griswold v. Connecticut, 1965, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510. Is wearing a beard a form of constitutionally protected expression, i. e., a type of symbolic act that is within the free speech clause of the First Amendment such as the wearing of an armband? Cf. Tinker v. Des Moines School Dist., 1969, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731. As substantial and thought-provoking as these questions are, it is unnecessary to consider them further in view of the court's acceptance of plaintiff's alternative contention which pertains to all four reasons for his dismissal.

■ Whatever the derivation and scope of plaintiff's alleged freedom to

1. There is no question that plaintiff was not given thirty days' notice of termination as required by his contract. However, the notice provision of the contract appears to apply only to the time period between decision to terminate and effective date of termination and not to the termination decision process itself.

2. Defendants made no such showing in this case. In particular there was no indication in the evidence that plaintiff's wear-

ing a beard would materially and substantially disrupt school work and discipline. Cf. Tinker v. Des Moines School Dist., *supra*, at 513–514, 89 S.Ct. 733. Indeed, the resignation of all members of the school committee immediately after dismissing plaintiff and their prior refusal to answer the townspeople's questions about any charges against him suggest that they were imposing their own personal standards concerning beards.

wear a beard, it is at least an interest of his, especially in combination with his professional reputation as a school teacher, which may not be taken from him without due process of law. Cafeteria and Restaurant Workers v. McElroy, 1961, 367 U.S. 886, 894–899, 81 S.Ct. 1743, 6 L.Ed.2d 1230. As stated in Birnbaum v. Trussell, 2 Cir., 1966, 371 F.2d 672, 678 following a discussion of several Supreme Court decisions:

> The principle to be extracted from these cases is that, whenever there is a substantial interest, other than employment by the state, involved in the discharge of a public employee, he can be removed neither on arbitrary grounds nor without a procedure calculated to determine whether legitimate grounds do exist.

Plaintiff's interest in wearing a beard and in his career as a teacher is not nullified by his having been employed less than the three years required to achieve tenure status. Bomar v. Keyes, 2 Cir., 1947, 162 F.2d 136, 139. Defendants' argument, that plaintiff has no constitutional right to work for the school system of Monson, citing United Public Workers v. Mitchell, 1947, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754, was specifically rejected in Wieman v. Updegraff, 1952, 344 U.S. 183, 191, 73 S.Ct. 215, 219, 97 L.Ed. 216, wherein the Supreme Court said, "To draw from this language the facile generalization that there is no constitutionally protected right to public employment is to obscure the issue."

■ Two substantial deficiencies were present in the procedure following in suspending and dismissing the plaintiff. First, plaintiff was not told what the charges against him were and that his refusal to remove his beard would result in his dismissal. Plaintiff was forced to guess as to the charges against him and as to what action, if any, the school committee might take. On the latter point, at least, plaintiff may have guessed wrong. No reason has been advanced by the defendants as to why plaintiff should have been forced to make these guesses. The second deficiency involves the form of the decision making process of the Monson school committee. Prior to plaintiff's dismissal there was no written or announced policy of the Monson school committee that male teachers should not wear beards in the classroom.[3] The proceedings against plaintiff therefore were of a dual nature involving, first, a rule-making or legislative-type function to determine whether the wearing of a beard should be grounds, for dismissal of a teacher and, second, a judicial-type function to determine whether plaintiff was wearing a beard without a reasonable explanation and whether dismissal was a suitable sanction. The indiscriminate merging of these two functions served to cloud the questions at issue and to shield the board's determination from public view. Plaintiff in effect lost any right to present evidence in the judicial-type proceeding and the community as a whole lost any right to participate in a meaningful way in the legislative-type rule-making proceeding.

■ The particular circumstances of a dismissal of a public school teacher provide compelling reasons for application of a doctrine of procedural due process. "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." Shelton v. Tucker, 1960, 364 U.S. 479, 487, 81 S.Ct. 247, 251, 5 L.Ed. 2d 231. "Scholarship cannot flourish in an atmoshpere of suspicion and distrust." Sweezy v. New Hampshire, 1957, 354 U.S. 234, 250, 77 S.Ct. 1203, 1212, 1 L.Ed.2d 1311. The American public school system, which has a basic responsibility for instilling in its students an appreciation of our democratic

---

3. The statement in the student dress code, apparently adopted on the basis of Leonard v. School Committee of Attleboro, 1965, 349 Mass. 704, 212 N.E.2d 468, 14 A.L.R.2d 1192, that "Moustaches and beards will not be tolerated," noted above, was conceded by defendants not to apply directly to teachers.

system, is a peculiarly appropriate place for the use of fundamentally fair procedures. This is particularly so where, unlike the cases involving loyalty programs, no state interest has been advanced in justification of summary or abbreviated procedures. See 1 Davis, Administrative Law Treatise (1958 ed.), § 7.13, 463, 473.

 Plaintiff is entitled to the benefits of his position as a teacher in the Monson public schools, including salary, unless and until he is lawfully separated from that position.[4] No school committee regulation or rule prohibiting outside employment was indicated by the evidence; therefore no deduction should be made for wages or salaries earned by plaintiff in the interim. Lost salary was stipulated to be in the amount of $1,575.00. As additional compensatory damages, the court awards plaintiff $1,000 for pain and suffering connected with his loss of weight and aggravated ulcer condition which were proximately caused by his unlawful dismissal. Because of the good faith reliance by the defendants upon relevant Massachusetts statutes, the court makes no award for plaintiff's emotional distress, see 1 Restatement of Torts 2d, § 46, nor of punitive damages.

Accordingly the following orders and injunction shall be entered: (1) that the orders of the defendants suspending and dismissing plaintiff as a teacher in the Monson public schools violated the due process clause of the Fourteenth Amendment of the Constitution of the United States and are declared to be unlawful and null and void;[5] (2) that plaintiff is entitled to the benefits of his contract as a teacher in the Monson public schools, including the right to compensation without deduction for moneys otherwise earned, throughout the remainder of the term of the contract; (3) that judgment be entered for plaintiff against the defendants, James Duggan, Lena Mae Skwark, Walter D. Raleigh, Adolph S. Jurczyk, Jr., Harold G. Bailey and William F. Donovan in the amount of $2,575, plus costs of this action; and (4) that the defendants, their officers, agents, attorneys and all other persons in active concert or participation with them are hereby restrained and enjoined from giving any effect whatsoever to the orders of suspension and dismissal herein declared null and void.

---

4. Whether the effect of this ruling is to confer tenure status upon plaintiff under Mass.G.L. c. 71, § 41 by virtue of defendants' understandable omission to notify him by April 15, 1969 that he would not be rehired for the next school year is a question of state law not now at issue.

5. The court has considered and rejects plaintiff's further prayer that Mass.G.L. c. 71 §§ 42 and 42D be declared unconstitutional *per se* because they deny non-tenure teachers equal protection of the laws. "There are valid reasons for treating the probationary teacher differently from the permanent teacher." Developments in the Law—Academic Freedom, 81 Harv.L.R. 1045, 1092.