FRANCINE E. BLACK vs. SCHOOL COMMITTEE
OF MALDEN & another
(and a companion case[1]).

Middlesex.    January 9, 1974. — April 26, 1974.

Present: TAURO, C.J., REARDON, BRAUCHER, HENNESSEY, & KAPLAN, JJ.

*School and School Committee.    Equity Jurisdiction,* Declaratory relief,
   Administrative matter.    *Massachusetts Commission Against Dis-*
   *crimination.    Constitutional Law,* Due process of law, Equal protec-
   tion of laws.    *Damages,* Back pay, Mitigation of damages.    *Words,*
   "Dismissal."

Where women public school teachers filed complaints with the Mas-
   sachusetts Commission Against Discrimination alleging dis-
   crimination by the school committee against them on the ground of
   sex in termination of their employment for pregnancy and the
   commission suggested terms of conciliation, but the terms were not
   accepted by the teachers and no further steps were taken in the
   proceedings before the commission, which were considered by the
   parties to be abandoned, the teachers were not precluded by such
   proceedings from maintaining suits in equity against the school
   committee for declaratory and consequential relief as to the termina-
   tion of their employment. [202-203]
Letters of a superintendent of schools to women teachers on tenure
   "terminating" their employment by reason of their pregnancy were
   not to be construed as attempted dismissals of the teachers under
   G. L. c. 71, § 42, without compliance with the procedural require-
   ments of § 42, but as intended to enforce a rule of the school
   committee requiring pregnant teachers to leave their employment
   and providing for their subsequent reinstatement upon certain
   conditions. [203-205]
A rule of a school committee requiring a pregnant teacher to "resign" by
   the fourth month of her pregnancy and providing generally that she
   would not be eligible for reinstatement until six months after the
   birth of her child and then only on certain conditions including
   existence of a vacancy was invalid as violative of the due process

---

[1] Kathleen M. Lane *vs.* School Committee of Malden & another.

clause of the Fourteenth Amendment of the Federal Con-
stitution. [205-208]

A rule of a school committee denying all sick pay to a teacher absent from
work because of disability through pregnancy while allowing sick
pay for temporary absence through other disabilities established an
arbitrary classification and denied equal protection of the laws. [209-
211]

With respect to the right of tenured public school teachers to back pay by
reason of wrongful termination of their employment by the school
committee, the usual principles of mitigation of damages were
applicable whether or not G. L. c. 71, § 43A, was applicable. [211-
213]

BILL IN EQUITY filed in the Superior Court on July 21,
1972.

The suit was heard by *Chmielinski*, J.

*Leo P. De Marco*, City Solicitor, for the School Com-
mittee.

*Robert I. Deutsch* (*Paul H. Rothschild* with him) for
Francine Black.

*Gerald B. Gallagher* (*Robert D. Smith* with him) for
Kathleen M. Lane.

*Jeffrey M. Freedman*, for Massachusetts Teachers Asso-
ciation, amicus curiae, submitted a brief.

KAPLAN, J.    The school committee and superintendent
of schools of Malden, defendants, appeal from a final
decree against them in declaratory suits brought by two
teachers in the Malden public schools. The questions relate
to so called "maternity leave" and our task has been
lightened by recent decisions of the Supreme Court of the
United States on the constitutional aspects of that subject.
See *Cleveland Bd. of Educ.* v. *LaFleur*, and the companion
case *Cohen* v. *Chesterfield County Sch. Bd.* 414 U. S. 632
(1974).[2]

The facts of the present appeals are set out mainly in
statements of agreed facts and stipulations of the parties.
The plaintiffs, Mrs. Francine Black and Mrs. Kathleen M.
Lane, were engaged as teachers by the Malden school

_____

[2] The Massachusetts Teachers Association as amicus curiae in the present
cases has filed a helpful brief discussing the constitutional issues.

department in September, 1964, and after September, 1967, they qualified under the provisions of G. L. c. 71, § 41, as teachers serving "at discretion," i.e., with tenure. It can be surmised that their pregnancies occurred in late June or early July, 1968. Early in November, 1968, they severally informed the superintendent of schools that they were pregnant and requested leaves of absence on that account to commence on January 2, 1969.

In purported response to these requests the school committee voted at its meeting on November 12, 1968, to accept the plaintiffs' "resignations" effective December 31, 1968, "in view of the fact" — as the superintendent wrote — that "leaves of absence are not granted for maternity reasons." Although the letters did not refer expressly to any rules of the school committee, they were a reflection of c. IV, § 15, of those rules, providing that a married teacher must resign her position at the end of the fourth month of pregnancy, and, further, that she was then not eligible for reinstatement until six months after the birth of her child. The text of § 15 is reproduced in the margin.[3]

The plaintiffs answered the committee promptly, denying that they had ever offered to "resign" or that the school committee had any authority to accept their "resig-

---

[3] "*a.* No married woman employee of the Public Schools shall be permitted to teach or perform her duties after the end of the fourth month of pregnancy but must resign from her position.

"*b.* Any employee who has had to resign for maternity reasons may be eligible for reinstatement six months after the date of birth of the child; provided, however, that the employee seeking reinstatement shall have applied in writing to the superintendent of schools at least one month prior to the date of desired reinstatement. If no vacancy is available at the time of request for reinstatement, the employee may have to wait until the opening of the next school-year in September for assignment. Every applicant for reinstatement, shall, prior thereto, furnish to the superintendent of schools a physician's certificate certifying that the employee is physically and mentally qualified to resume her duties. Any employee having resigned for maternity purposes may have the six-months' waiting period terminated for cause by the School Committee at any time, on application of the employee, approved by the superintendent of schools.

"*c.* Upon reinstatement the employee shall be entitled to the same position on the salary schedule to which she would have been entitled had she been working; provided, however, that no sick-leave benefits shall accrue during such leave. Upon reinstatement the employee may be returned to her former position, if possible, or to a similar position if one be vacant for which she is professionally qualified."

nations." They said they were withdrawing their requests for leaves and intended to continue to carry out their teaching duties. Early in December, 1968, the plaintiffs filed complaints with the Massachusetts Commission Against Discrimination (MCAD) alleging that the school committee had discriminated against them on the ground of sex, but they continued to teach through January 31, 1969, after which they absented themselves. They received paychecks through March 10, 1969, which evidently included sick pay for thirteen consecutive teaching days after January 31 on which they were absent (plus pay for other benefits). These March checks were the last they received, and they have not taught in the Malden schools since.

Rather inconsistently with the attitude shown in the vote of November 12, 1968, the superintendent of schools wrote to the plaintiffs on March 11, 1969, quoting from the school committee's rules as to sick leave[4] and requesting a physician's certificate of disability with respect to their absence. The plaintiffs complied with the request by furnishing letters from their physicians stating that they were under doctors' care and unable to work at the time. But on March 21, 1969, the superintendent wrote to the plaintiffs advising

---

[4] Chapter IV, §§ 12-14, of the rules of the school committee of Malden provide:

"*Section 12.* A teacher absent because of illness shall forfeit her salary for time in excess of her accumulated sick leave during the school-year....

"*Section 13.* Any teacher who shall hereafter suffer an enforced absence from school because of personal illness for a period of time greater than the fifteen (15) days allowed in any one school-year shall receive the benefits of cumulative sick leave as hereinafter defined.

"Cumulative sick leave is the sum of all unused portions of a teacher's annual allowance for sick leave, — but not to exceed a period of five years and not to exceed a maximum of seventy-five (75) days....

"*Section 14.* A written notice of application for benefit under the sick-leave rule accompanied by a statement of the beneficiary's physician must be presented to the superintendent of schools within seven (7) days after the commencement of the disability, or for any sick leave at the request of the superintendent. Thereafter at the end of each two weeks the beneficiary shall file with the superintendent of schools an absentee's certificate of disability signed by her physician. The School Committee reserves the right to require the certificate of the school physician or city physician in addition to the foregoing certificate. Failure to comply with the regulations governing sick-leave shall, in the discretion of the School Committee, deprive the applicant of participation therein."

them that sick leave benefits did not extend to pregnancy and "terminating" their employment as of that date.[5] Mrs. Black's child was born on April 4; Mrs. Lane's on March 30.

On April 7, 1969, MCAD's investigating commissioner notified the superintendent of schools that he had made a finding of probable cause in respect to the complaints and he suggested terms of conciliation which included a revocation of the termination order of March 21, 1969, a six months' maternity leave retroactive to January 31, 1969, with a right to return by July 31, 1969, with benefits, if the teachers manifested acceptance by that date, and payment of $250 to each of them for expenses and inconvenience incurred. The commissioner asked for a response from the Malden authorities by April 16, 1969. The school committee, however, took no action until July 1, 1969, when it voted to accept the MCAD terms and so informed the plaintiffs and the commission. The plaintiffs did not concur. The retroactive six month leave would have required them to repay the money received for the period following January 31, 1969 (more than $900 in each case), meaning in effect that they would not receive any sick pay during the period of the proposed maternity leave.

There were no further proceedings before the MCAD. In the impasse the teachers commenced in the Superior Court actions of mandamus later amended by leave of court into petitions for declaratory and consequential relief. The suits eventuated in the final decree under review (covering both cases) declaring the dismissals of the plaintiffs from employment to be illegal and a nullity, ordering reinstatement of the plaintiffs at the pay scale and with the seniority and other benefits they would otherwise have attained, and awarding Mrs. Black a total of $41,144 for unpaid salary to the time of decree and interest thereon and expenses of suit

[5] The superintendent's letter stated in part, "Your letter [of early November] . . . indicated that you were pregnant. Further evidence submitted by you to us has not indicated a change in this condition. Consequently your employment is terminated as of this date."

— see G. L. c. 71, § 43B[6] — and making a like award to Mrs. Lane of $45,939.49.[7]

1. In their argument in this court the defendants suggest that the present actions are barred because of the institution of the MCAD proceedings. General Laws c. 151B sets out an administrative procedure for enforcement of the anti-discrimination statutes of the Commonwealth. See our recent decision in *East Chop Tennis Club* v. *Massachusetts Commn. Against Discrimination,* 364 Mass. 444, 446-448 (1973). The sense of c. 151B, § 9, is that recourse to judicial remedy for an alleged unlawful practice within the statute (see § 4) is precluded when MCAD proceedings are pending covering the same grievance. But the MCAD complaints, filed more than three months before the termination letters of March 21, 1969, concerned only the failure of the school committee to grant the plaintiffs leaves of absence for pregnancy and the committee's attempted acceptance of the plaintiffs' nontendered resignations. In contrast, the plaintiffs' suits complained of the March 21 dismissals and looked to reinstatement with back pay. The investigating commissioner's conciliation proposal was an effort to resolve the entire controversy which had become significantly enlarged since the filing of the MCAD complaints. It may be questioned whether the Commissioner could thus on his own motion extend the matters which had been confided to the commission and by that means foreclose the plaintiffs' recourse to judicial remedies. In all events the administrative proceedings ceased when the conciliation proposal failed of acceptance. At that point it was up to the commission, under c. 151B, § 5, to issue its own notice calling for a hearing (or commence a suit in equity in the Superior Court). The commission did not act, and no further steps have been taken over a period of more

---

[6] Section 43B provides for reimbursement of expenses incurred by the teacher in defending himself against unwarranted removal or suspension, but not to exceed ten per cent of the amount of compensation recovered.

[7] The foregoing statement of the cases is supplemented below by reference to certain further stipulations by the parties.

than four years. In fact it appears that all concerned viewed the resort to MCAD as moot or abandoned after negotiations broke down and the plaintiffs had presented to the court the basic issue of the legality of the Malden rules with its constitutional implications. As § 9 is not applicable on these facts, we need not inquire whether, having omitted to raise in the court below, as a ground for abating the present suits, the issue of the plaintiffs' failure to pursue the administrative process, the school committee may be heard to make that contention for the first time in this court. Cf. *Westland Housing Corp.* v. *Commissioner of Ins.* 346 Mass. 556, 557 (1963); *Massachusetts Mut. Life Ins. Co.* v. *Massachusetts Life Ins. Co.* 351 Mass. 283, 285, 289 (1966).

2. By its letters of March 21, 1969, the school committee unilaterally "terminated" the plaintiffs' employment. The plaintiffs argue that the terminations were acts of "dismissal" of tenured teachers within G. L. c. 71, § 42,[8] and illegal because they were not preceded by notice and hearing and accompanied by the other procedural safeguards envisaged by this fundamental statutory provision.[9] It is agreed that the defendants did not purport to comply with that statute, but they maintain that what was involved in each case was a "forced resignation" (as they call it) under the rule as to pregnancy quoted in n. 3 above, and so § 42 did not apply.

The letters of March 21 were abrupt and flat, susceptible of the meaning that the plaintiffs were absolutely terminated without any chance of reinstatement, possibly be-

---

[8] Perhaps the argument may take the turn that action which can be reasonably interpreted as a dismissal, and which is contested, should be treated as a dismissal within § 42.

[9] Section 42 provides that no teacher shall be dismissed unless by a two-thirds vote of the whole school committee. A tenured teacher shall not be dismissed except for inefficiency, incapacity, conduct unbecoming a teacher, insubordination, or other good cause. The teacher must be given thirty days' notice of the meeting at which dismissal is to be voted. If the teacher requests, the committee must furnish written charges and grant a hearing before it at which the teacher may be represented by counsel, present evidence, and call and examine witnesses. The superintendent must give his recommendations on the charges and the charges must be substantiated. (Other features of § 42 are mentioned below.)

cause of their refusal to resign and quit work as required by the rule. The plaintiffs point out that the school committee has never affirmatively invited them to return. All this looks like "dismissal." But we think the letters are rather to be construed as a final though belated decision by the school committee, after internal deliberations, to enforce their rule, especially as to reinstatement. Indeed, in the case of the plaintiff Lane the statement of agreed facts makes it explicit that the termination was in accordance with the rule requiring the pregnant teacher to resign, which implies rights of later reinstatement.

Seen in this light, the terminations were not dismissals within § 42, for that section deals with complete separation from the job. See, e.g., *Boody* v. *School Comm. of Barnstable*, 276 Mass. 134, 138 (1931); *Downey* v. *School Comm. of Lowell*, 305 Mass. 329, 331 (1940). Cf. *Western Elec. Co. Inc.* v. *Director of Div. of Employment Security*, 340 Mass. 190 (1960). The point is reinforced by the statement in § 42 that that section shall not affect the right of the committee to dismiss a teacher whenever a decrease in the number of pupils in the schools renders such action advisable, and the further statement that no teacher lawfully dismissed shall receive compensation for services rendered thereafter. To be sure, for a teacher to be "dismissed," he need not be wholly banished from the school system; it is exclusion from the job or "category" that counts. Thus in *McCartin* v. *School Comm. of Lowell*, 322 Mass. 624 (1948), the removal of a superintendent of schools from his post as such was held to be a dismissal although he was offered a position as a teacher.[10] On the other hand, a party in that case who had been demoted from principal to teacher was held not dismissed because the demotion was thought to involve only a shift of duties, a principal being merely a superior sort of teacher. (But see, now, G. L. c. 71, § 42A, as to demotion of principals.)

In saying that § 42 did not control on the present facts,

[10] In fact he was restored to his post as superintendent during the pendency of the suit; but it was the character of the initial removal that was in issue.

we are aware that the terminations might involve a sizeable postponement of the plaintiffs' resuming their jobs. Unless there was a waiver of the normal six-month waiting period, these plaintiffs would not be eligible for reinstatement until October, 1969, at the earliest, and then their reinstatement was subject to contingencies that might defer their reëntry into the system for a considerable period.[11] Nor can it be said that it would necessarily have been futile to accord the plaintiffs § 42 procedural rights because the fact of their pregnancy was not fairly debatable, cf. *Jantzen* v. *School Comm. of Chelmsford,* 332 Mass. 175 (1955); *Kaplan* v. *School Comm. of Melrose,* 363 Mass. 332 (1973), for at a hearing the plaintiffs might have argued the question of "good cause," possibly resulting in a committee decision to revise its rule to constitutional norms. (Excerpts from the minutes of the committee during this period, which appear of record, indicate that there was sentiment favoring change.) Still we think § 42 was inapplicable; and the plaintiffs do not contend that the terminations ran afoul of any other statutory procedure.[12]

3. Apart, however, from matters of procedure, we think the terminations were in substance illegal to the point of unconstitutionality. Questions of this order were making their way through the lower courts as the present controversy developed and have now been dealt with by the Supreme Court opinions in the *Cleveland* and *Chesterfield County* school cases.

In outline, the Supreme Court held that school board regulations not materially different from Malden's, requiring that teachers cease teaching and take leave as early as

---

[11] Note that under rule 15 (b) and (c), n. 3, *supra,* reinstatement of the teacher is not guaranteed. If no vacancy is available at the time of request for reinstatement, the teacher may have to wait until the next school year for assignment. Further, the rule implies that even then the employee may not be reinstated if a vacancy for which she is professionally qualified does not exist at the time.

[12] They do not contend that these were "suspensions" within § 42D which lays down a procedure for hearing, and so forth, in such an event. Although the petitions refer to constitutional rights of hearing, the plaintiffs do not attempt to bring themselves within *Board of Regents of State Colleges* v. *Roth,* 408 U. S. 564 (1972), *Perry* v. *Sindermann,* 408 U. S. 593 (1972), or similar cases.

four or five months before the expected date of birth, and materially trammeling the teachers' eligibility to return to work, offended the due process clause of the Fourteenth Amendment.[13] The court found that such rules, by "acting to penalize the pregnant teacher for deciding to bear a child," put a heavy burden on the "freedom of personal choice in matters of marriage and family life [that] is one of the liberties protected by the Due Process Clause" against needless, arbitrary, or capricious State action. 414 U. S. at 639-640 (1974).

Justice Stewart for the majority examined two explanations offered by the school authorities to justify their mandatory maternity leave rules — explanations also offered by the defendants in the present cases — and found them wanting; he concluded that the rules bore no rational relationship to the State interests urged in their support.

First, continuity of instruction of students was not furthered by prescribing firm dates for the teachers' quitting early in pregnancy. Indeed this policy could frustrate attainment of the claimed objective in many cases by needlessly causing the substitution of teachers in mid-semester or near the end of a school year. The desired continuity could be adequately promoted by requiring the teacher to name, well in advance, a date certain for commencement of leave, and taking care to ensure availability of substitute teachers for emergencies. Second, the

---

[13] For the text of the pertinent regulations, see nn. 1 and 5 of the majority opinion, 414 U. S. at 635, n. 1, 637-638, n. 5 (1974).

The *Cleveland* rule required the pregnant teacher to take a maternity leave without pay beginning at least five months before the expected birth of her child. Application for leave had to be made at least two weeks before its effective date. A teacher could not return to work earlier than the beginning of the regular school semester which followed the child's attaining the age of three months, although exceptions to this requirement could be made. Written request for reinstatement had to be made at least six weeks prior to the beginning of the semester in which the teacher expected to return, and must be accompanied by a doctor's certificate. Priority in reassignment was granted, but reëmployment was not promised. Failure to comply with the rule was to be construed as termination of contract or as ground for dismissal.

The *Chesterfield County* rule looked to leave commencing at least four months before the expected birth, with notice six months before the birth. The reinstatement provision is mentioned in the text below.

challenged rules were held to sweep too broadly in attempt-
ing to further a legitimate objective of keeping physically
unfit teachers out of the classroom; here the rules went on a
"conclusive" or "irrebuttable presumption of physical
imcompetency" at the fixed early stage of pregnancy that is
neither "necessarily nor universally true." 414 U. S. at 644-
646,[13a] 647-648 (1974). Due process required some "individ-
ualized determination" by competent medical judgment of
the particular teacher's ability to continue to teach. 414
U. S. at 644. The administrative convenience that could be
claimed for rules that avoided case-by-case determination
was not weighty enough to validate an otherwise prej-
udicial scheme. The court, however, kept open the possi-
bility that a rule terminating employment "at some firm
date during the last few weeks of pregnancy" might be
permissible. 414 U. S. at 647, n. 13 (1974).

The court also held that limiting a teacher's right to
return to work until the beginning of the semester following
the date on which her child was three months old (as in the
*Cleveland* case) rested again on an "irrebuttable presump-
tion" of disability that was unnecessary, arbitrary, and
irrational and so in violation of due process. 414 U. S. at
649-650 (1974). On the other hand, disallowing return
before the commencement of the semester following the
birth and requiring a physician's certificate attesting to the
teacher's health (as in the *Chesterfield County* case) were
thought valid expedients — "narrowly drawn methods of
protecting the school board's interest in teacher fitness"
and "avoiding unnecessary changes in classroom personnel
during any one school term." 414 U. S. at 648-649 (1974).[14]

In a concurring opinion, Justice Powell skirted irrebut-
table presumptions and employed equal protection

---

[13a] The last phrase was quoted from *Vlandis* v. *Kline*, 412 U. S. 441, 452 (1973).

[14] Justice Rehnquist, in an opinion joined in by the Chief Justice, dissented
from the use of the due process clause to invalidate regulations which, examined
with the majority's technique, would appear arbitrary in individual cases: "The
Court's disenchantment with 'irrebutable presumptions,' and its preference for
'individualized determination,' is in the last analysis nothing less than an attack
upon the very notion of lawmaking itself." 414 U. S. at 660 (1974).

analysis — "rational basis standards of equal protection review" — reaching thereby the conclusion that the school board had acted on classifications "either contraproductive or irrationally overinclusive." 414 U. S. at 651-657 (1974).[15] Nearly all the opinions of State and lower Federal courts considering this question and finding similar rules unconstitutional are based at least in part on denial of equal protection.[16]

Whichever may be the sounder ground of constitutional decision, there can now be little doubt that the rule of the Malden school committee must be held invalid at both ends — in its provision for mandatory "resignation" by the fourth month of pregnancy, and in its provision for a six-month waiting period after birth before reinstatement is possible.

Although the defendants' efforts to justify the terminations under the rule, as written, are now vain, we go on to consider whether the treatment actually accorded these plaintiffs was perchance compatible with constitutional standards. The plaintiffs in fact remained at work well along in their pregnancies until they decided for themselves that they could no longer continue, thus securing, after a fashion, "individualized determination." On the other hand, assuming that the letters of March 21, 1969, are to be read as a decision to enforce the rule at least as to reinstatement, rather than as absolute terminations, the plaintiffs faced at least a six-month waiting period, no less objectionable than the corresponding regulation struck down in the *Cleveland* case. The conciliation proposal of MCAD contemplated reinstatement by the September, 1969, opening of school, and the acceptance of the proposal

---

[15] Justice Powell observed that historically "a principal purpose behind the adoption . . . [of regulations such as those at bar] was to keep visibly pregnant teachers out of the sight of school children" and that this fact "casts a shadow over these cases." 414 U. S. at 653 (1974). Justice Stewart also referred to this history. 414 U. S. at 641, n. 9 (1974).

[16] Besides lower court opinions in the *Cleveland* and *Chesterfield County* cases (465 F. 2d 1184 [6th Cir. 1972]; 326 F. Supp. 1159 [E. D. Va. 1971]), see, e.g., *Green* v. *Waterford Bd. of Educ.* 473 F. 2d 629 (2d Cir. 1973); *Heath* v. *Westerville Bd. of Educ.* 345 F. Supp. 501 (S. D. Ohio 1972).

by the committee could possibly be viewed as an equivalent "offer" to the plaintiffs. But although otherwise ready and willing to resume teaching at the opening of school in September (as they have stipulated), the plaintiffs balked at an offer that was conditioned on their accepting a retroactive six-month leave of absence from January 31, 1969, during which they would receive no sick pay and evidently could not accumulate further rights to paid sick leave. The school committee minutes indicate that even after March 10, 1969, the plaintiffs had from fifteen to twenty days of accumulated sick leave remaining to their credit.

The Supreme Court was not called on to say in the recent decisions whether a teacher absent from work because of pregnancy-related disabilities could be accorded diametrically different rights to sick pay than a teacher suffering from other temporary physical disability. But a classification such as that exemplified by the Malden sick leave rule appears arbitrary and unconstitutional, whether or not one relates it to discrimination based exclusively on sex, see *Frontiero* v. *Richardson*, 411 U. S. 677 (1973); *Reed* v. *Reed*, 404 U. S. 71 (1971); *Stanley* v. *Illinois*, 405 U. S. 645 (1972); cf. *Green* v. *Waterford Bd. of Educ.* 473 F. 2d 629 (2d Cir. 1973);[17] and especially is the classification invidious, since it burdens fundamental freedom of choice in marriage and family life. The Malden rule evidently applied to all illnesses or medical conditions causing absence from work — except pregnancy. The only justification suggested to us was that, with the means of family planning available today, pregnancy with its attendant infirmities is a condition "voluntarily" assumed, unlike ordinary sickness and injury which are said to be "involuntary." The distinction is shallow. We are not really helped by trying to classify pregnancy as "voluntary" or "involuntary."[18] It is rather a

---

[17] The *Cleveland* and *Chesterfield County* opinions did not speak in terms of sex classification. See Powell, J., concurring, 414 U. S. at 653, n. 2 (1974).

[18] "The perpetuation of the human race cannot be termed a voluntary act, but it rests upon instincts and desires, which are fundamentally imperative." *Sullivan* v. *Old Colony St. Ry.* 197 Mass. 512, 515 (1908).

natural incident of married life that definitely results in disability, but of variable duration. See *Buckley* v. *Coyle Pub. Sch. Sys.* 476 F. 2d 92, 95 (10th Cir. 1973). In a sense, pregnancy is no more voluntary than disabilities incurred in the pursuit of nonessential activities with obvious risks of injury, such as playing games or even driving an automobile. Note, 7 Harv. Civ. Rts.-Civ. Lib. L. Rev. 260, 288 (1972). We are not to be understood as intimating that no State interests can ever conceivably be asserted to justify particular distinctions for purposes of sick leave betweeen pregnancy and other disabilities. See *Aiello* v. *Hansen*, 359 F. Supp. 792 (N. D. Cal. 1973 — three-judge court).[19] It is enough for this case to say that categorical disallowance of all sick pay for disabilities related to pregnancy was improper when sick leave was allowed for the other disabilities whether voluntary, predictable, normal, or unique. See *Bravo* v. *Board of Educ. of Chicago*, 345 F. Supp. 155, 159 (N. D. Ill. 1972).[20] We note that the Equal Employment Opportunity Commission in its 1972 guidelines pursuant to Title VII of the Civil Rights Act of 1964, 42 U. S. C. §§ 2000e-2000e-15 (1970), stated not only that a mandatory leave or termination policy for pregnancy is

---

[19] Appeal pending sub nom. *Geduldig* v. *Aiello*, (March 26, 1974). 42 U. S. L. W. 3553. The *Aiello* case involved a challenge by employees who had undergone normal or aggravated pregnancies to a provision of the California Unemployment Insurance Code ( § 2626) that excepted pregnancy-related work loss from the coverage of the State contributory disability insurance program during pregnancy and until twenty-eight days after termination of pregnancy. Judge Zirpoli examined a number of State interests that were claimed to justify the exclusion of pregnancy-related disabilities from the generality of disabilities qualifying for compensation. On the particular facts he found the exclusion unsupported by a substantial rational purpose, see *Reed* v. *Reed,* 404 U. S. 71, 76 (1971). Accordingly, the responsible State official was ordered to grant all the plaintiffs, including one who had had a normal pregnancy, such benefits as they were entitled to without regard to the challenged exclusion.

[20] In the *Bravo* case the plaintiff challenged under the Civil Rights Act the school board's treatment of teachers on maternity leave. The court remarked: "Teachers on illness leave are allowed to draw pay for their accrued 'sick pay' days; pregnant teachers are not. Pregnant teachers get no seniority for the period of their leave; those on leave for illness do. The Board has offered no reason for these differences in benefits between teachers who are ill and those who are pregnant. Plaintiff has met her burden of showing a reasonable probability of success on her claim that there is no rational and substantial basis for the Board's distinction between pregnancy and other medical conditions for the purposes of determining employment benefits." (345 F. Supp. at 159 [1972].)

considered prima facie invalid, but also that maternity leave must be treated like leave for any other temporary disability. 29 C. F. R. (1973) § 1604.10 (b). 37 Fed. Reg. 6837 (April 5, 1972). Since 1972, Title VII has applied to State agencies and educational institutions. Act of March 24, 1972, Pub. L. 92-261, 86 Stat. 103. See *Wetzel* v. *Liberty Mut. Ins. Co.* 372 F. Supp. 1146 (W. D. Pa. 1974).[21] See also G. L. c. 149, § 105D, and c. 151B, § 4 (11A) (both added by St. 1972, c. 790, § 1, 2), and regulations on maternity leave and sex discrimination in employment promulgated by MCAD on May 24, 1973.

4. As the terminations were improper for the reasons discussed, the plaintiffs as tenured teachers are entitled to reinstatement with benefits.[22] See *Ransom* v. *Boston,* 192 Mass. 299 (1906); *S. C.* 193 Mass. 537 (1907); *S. C.* 196 Mass. 248 (1907). Cf. *Lowry* v. *Commissioner of Agriculture,* 302 Mass. 111 (1939); G. L. c. 71, § 43A. But a question is raised about the plaintiffs' entitlement to back pay. The defendants invoke the usual doctrine of mitigation applicable to discharges under contracts for personal service: if the discharged employee could by reasonable efforts have disposed of his time by finding comparable employment, and thus reduced his loss, he will to that extent be denied a monetary recovery. See *Clark* v. *General Cleaning Co. Inc.* 345 Mass. 62, 65 (1962); Restatement: Contracts, § 336 (1932); Williston, Contracts (3d ed.) §1353 (1968). In *McKenna* v. *Commissioner of Mental Health,* 347 Mass. 674, 677 (1964), the usual concepts were

---

[21] The court in the *Wetzel* case held that an employer's income protection plan through contributory insurance providing for the continuation of income during long-term illness, but allowing no benefits for disabilities due to pregnancy, discriminated against women in violation of Title VII, as interpreted by the EEOC guidelines. The court pointed out that there is no statutory requirement that an employer offer any particular disability benefits, but once he does so he may not create an inequality based on sex. (The Massachusetts legislation next cited in the text takes the same line.)

[22] The reinstatements will be without those benefits attributable to the period commencing on the date when, on proper mitigation by the plaintiffs, as indicated below in this point 4, they would have been reëmployed by Malden. The reinstatement of the plaintiff Lane is further subject to the doubt arising from point 5 (b) below.

applied to public employees. However, the plaintiffs contend that tenured teachers are excepted by c. 71, § 43A, from the rule regarding mitigation. That section says that when the Superior Court on judicial review finds that a teacher has been improperly dismissed after a vote by a school committee pursuant to § 42, it shall reinstate the teacher "without loss of compensation". But § 43A, even if applicable through § 42, would not abolish the mitigation rule for teachers. After extensive discussion of history and policy, we held in *Police Commr. of Boston* v. *Ciccolo*, 356 Mass. 555 (1969), that a provision of the civil service laws similar to § 43A — G. L. c. 31, § 45, stating that an employee unlawfully discharged shall be reinstated in his office "without loss of compensation" — did not change the rule of *McKenna* v. *Commissioner of Mental Health*, *supra*, and we see no reason to construe § 43A differently. The case cited by the plaintiffs, *McCartin* v. *School Comm. of Lowell*, 322 Mass. 624 (1948), does not analyze the issue of mitigation, nor does *Lucia* v. *Duggan*, 303 F. Supp. 112 (D. Mass. 1969).

But having advanced to this point, the defendants are met with the proposition that the burden of proof is on them, as the parties responsible for the improper terminations, to show that the plaintiffs would in fact have secured similar employment and mitigated losses, had they made reasonable efforts. *McKenna* v. *Commissioner of Mental Health, supra*, at 677. Corbin, Contracts, § 1039 (1964).[23] The defendants say that the plaintiffs could have returned to their jobs in the Malden system merely by joining with the school committee in accepting the investigating Com-

---

[23] There is a stipulation that the plaintiffs did not seek employment as teachers elsewhere. But, as was said in the *McKenna* case, *supra*, at 677: "McKenna [the plaintiff employee] is entitled to recover his back salary less what he did in fact earn following his discharge or in the exercise of proper diligence might have earned in another employment. While the respondents [public employer] showed that McKenna made no effort to secure other employment, they failed to show what he could have earned in other similar work. He, therefore, is entitled to recover from the Commonwealth . . . [his back pay]." See *Mass* v. *Board of Educ. of San Francisco Unified Sch. Dist.* 61 Cal. 2d 612, 627-628 (1964); Williston, *supra*, § 1360 (1968). Compare *Osadchuk* v. *Gordon*, 251 Mass. 540, 544-545 (1925), with *Maynard* v. *Royal Worcester Corset Co*. 200 Mass. 1, 6-7 (1908).

missioner's proposed terms of conciliation. But the refusal of the plaintiffs to do so does not satisfy the defendants' burden as to mitigation, even if the conciliation proposal is taken to be in effect an offer of reinstatement on the part of the defendants, for the proposal compromised the very constitutional right that the plaintiffs were and are asserting. See Williston, *supra*, § 1359, pp. 310-311 (1968); Corbin, *supra*, § 1043, pp. 274-275 (1964).

The record, however, shows plainly that under Malden's formal rule, the plaintiffs were entitled to apply for reinstatement six months after giving birth, with the chance, though not the certainty, of obtaining positions if not at that time, then eventually. The reinstatement provision was on its face unconstitutional, but it provided a means of mitigation, and it is not shown on this record that the defendants would have granted reinstatement under their rule only on the condition that the plaintiffs give up the remaining issues in their pending suit — a condition to which the plaintiffs would not be obliged to yield. This avenue of mitigation, presented by the record but not pursued below, should be explored on remand to the Superior Court. It implicates the further question, just when, having in view the plaintiffs' particular circumstances, the terms of the rule, and the situation within the school system, the plaintiffs could reasonably have been expected to apply for and secure reëmployment in the Malden schools. The defendants would be responsible for back pay and related benefits up to the time of that putative reëmployment, but not beyond. The burden, as we have indicated, will remain on the defendants.

5. In certain other particulars the cases likewise require remand for further proceedings to consider reduction of the defendants' liability for back pay.[24] (a) Of course the plaintiffs should not be awarded damages in excess of the salaries they would have earned if they had not been

---

[24] And see n. 6 above with respect to recovery by the plaintiffs of expenses of suit.

improperly discharged. *Louise Caroline Nursing Home, Inc.* v. *Dix Constr. Corp.* 362 Mass. 306, 310-311 (1972). *Ficara* v. *Belleau*, 331 Mass. 80, 82 (1954). Williston, *supra*, § 1338 (1968). In the computation made in the court below, no deduction was made for the time the plaintiffs would have been absent from work because of pregnancy-connected disability beyond the period covered by their available accumulated sick leave. The record does not contain the data which would enable us to make this calculation for ourselves.

(b) In the case of the plaintiff Lane, there is a stipulation that if returned to the job she "would have continued teaching until January 1, 1971." There is some obscurity here. In her brief, Mrs. Lane suggests that she is not bound "by the hypothetical in paragraph 13 [the quoted stipulation]," while the defendants in their brief curiously do not refer to the stipulation at all. If the stipulation means that Mrs. Lane would in no event have taught past January 1, 1971, then she may not receive back salary for any subsequent period. This requires further examination.

The decree is vacated and the cases are remanded for further proceedings as indicated in this opinion.

*So ordered.*